IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SEAN JORDAN, | § | |
| | § | No. 492, 2019 |
| Defendant Below, | § | |
| Appellant | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Case No. 1810005053 |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellees. | § | |

Submitted: August 5, 2020
Decided: September 22, 2020

Before **VALIHURA**, **VAUGHN**, and **TRAYNOR**, Justices.

## ORDER

This 22nd day of September, 2020, upon consideration of the parties' briefs and the record on appeal, it appears to the Court that:

(1)     Sean Jordan appeals his convictions in the Superior Court on several drug and firearm-possession charges, arguing that the Superior Court abused its discretion when it refused to admit his co-defendant's plea agreement and blocked him from presenting evidence relating to the grand jury indictment process.

(2)     On October 9, 2019, Wilmington Police received a 911 call reporting drug activity at 2206 Spruce Street in Wilmington. When the police officers arrived at the scene, they saw Jordan and his co-defendant Terrance Crosby in front of 2204

Spruce Street, a condemned residence owned by Eleanor Flemming. There was no residence at 2206 Spruce Street.

(3)   Jordan was sitting in a folding chair near a car parked in front of the condemned residence, while Crosby was sitting on a stool just near its front porch. A white plastic bag—later found to contain, among other things, a handgun—rested on the ground near Crosby's stool.

(4)   The police officers questioned and requested identification from both Jordan and Crosby. After verifying Crosby's identity, the officers discovered that he was wanted on an outstanding warrant. Crosby, who was in earshot of the officers, grabbed the white plastic bag and attempted to walk away. The police officers detained him and, upon searching the white plastic bag, found "a package of candy, a box of condoms and a loaded Smith & Wesson handgun."[1] As the police officers took Crosby into custody, Crosby said, "Everything in that bag is mine. It has nothing to do with him."[2] The officers arrested both Crosby and Jordan.

(5)   Upon questioning, Jordan told the officers that he was watching the condemned residence for its owner, Eleanor Flemming. When the police asked Flemming if they could search the dwelling, she consented. During the search, the police discovered a bag on the floor that contained wrapping paper, other material

---

[1] App. to Opening Br. at A085.
[2] *Id.* at A168.

2

for wrapping Christmas presents, 273 bags of heroin, 29 vials containing heroin, a box containing plastic baggies, a razor blade, and a digital scale. Flemming said that the Christmas bag and wrapping materials belonged to her, but disclaimed ownership of the heroin and the digital scale.

(6)     The police officers also requested and received consent from Crosby to search his blue pickup truck, in which the officers discovered a black digital scale and additional heroin.

(7)     The police officers then obtained a search warrant for Jordan's car and searched it, discovering a small glass jar with marijuana inside, a silver metal grinder, a black digital scale, and $914.

(8)     After arresting Jordan, the police officers also seized the two cell phones in Jordan's possession and extracted the text messages from them. Detective Alexis Schupp, a detective assigned to the Wilmington Police Department's Drugs and Organized Crime Division, testified that many of the text messages used language that was consistent with how drug sales are conducted. Schupp also testified that drug dealers frequently "switch out phones . . . [after] two weeks, a month, in order to keep police off their trail . . . ."[3] The earliest text message recovered from one of Jordan's phones was on September 28, 2018—two weeks before Jordan was arrested.

---

[3] *Id.* at A462.

(9) Throughout this entire process, Jordan consistently stated that he was watching 2204 Spruce Street for Flemming, that he did not know what Crosby had in the white plastic bag, and that he did not own the handgun found in that bag. The police did not find any fingerprints on the handgun. Jordan voluntarily provided a DNA sample, and forensic testing results, which were returned on February 1, 2019, showed that Jordan's DNA was on the trigger of the handgun.

(10) Jordan was charged with drug dealing offenses, possession of marijuana, possession of drug paraphernalia, and loitering. On December 3, 2018, a grand jury indicted Jordan on drug possession charges (drug dealing (tier 2), aggravated possession of a controlled substance, possession of drug paraphernalia), loitering, and firearm charges (possession of a firearm during the commission of a felony, carrying a concealed deadly weapon, possession of a firearm by a person prohibited, and possession of ammunition by a person prohibited). Jordan filed a motion, which the trial court granted, to sever the last two charges (referred to as the "B charges") from the other charges (the "A charges") of the indictment.

(11) Trial on the A charges was held on May 15 through May 20, 2019. During his opening statement, Jordan drew attention to the fact that he was indicted on the firearm charges before the forensic evidence showing his DNA on the handgun's trigger had come back; specifically, the grand jury indictment occurred on December 3, 2018 while the DNA test results came back on February 1, 2019. On

4

May 16, Jordan questioned the State's first witness—one of the police officers that arrested Jordan—about the grand jury indictment process and when Jordan was charged with the firearm-related crimes. The State objected on relevance grounds and filed a motion *in limine* that night. The next day, the court ruled that, while the dates of each event could be stated, Jordan could not ask the jury to use those dates to draw an inference that the grand jury indictment was flawed nor could he continue questioning witnesses to elicit evidence supporting that inference.

(12)  Additionally, before Jordan's trial, Crosby had pleaded guilty to possession of a firearm by a person prohibited, but, as of Jordan's trial, he had not yet been sentenced. Jordan sought to introduce evidence of Crosby's guilty plea. The Superior Court refused to admit the plea agreement, noting that the record did not show that, when entering the guilty plea, Crosby had admitted to exclusive possession of the firearm.

(13)  On May 22, the jury found Jordan guilty of carrying a concealed deadly weapon, drug dealing, aggravated possession, possession of a firearm during the commission of a felony – drug dealing; possession of a firearm during the commission of a felony – aggravated possession; possession of drug paraphernalia, and loitering for drug activity. The B charges were tried on May 22, and the jury returned guilty verdicts on both of the B charges on that date.

(14) On appeal, Jordan argues that the Superior Court erred by: (1) refusing to admit Crosby's plea agreement, and (2) refusing to allow Jordan to introduce evidence—specifically, evidence regarding when he was indicted on the firearm charges vis-à-vis when the State received the DNA test results—to challenge the grand jury indictment.

(15) We review evidentiary rulings for abuse of discretion.[4] If we conclude that there was an abuse of discretion, we then ask "whether the error rises to the level of significant prejudice which acted to deny [the accused] a fair trial."[5]

(16) When the Superior Court disallowed Jordan's bid to admit evidence of Crosby's guilty plea to a charge of possession of a firearm by a person prohibited, critical to the court's reasoning was that Crosby and Jordan were alleged to have been in joint possession of the firearm.[6] And while Crosby's plea could "be taken as an admission of [his] guilt, . . . it [could not] be construed as exonerating. . . Jordan of [his] possession charges."[7] This analysis represents a faithful application of our holding in *Potts v. State*,[8] in which the defendant sought to admit the guilty pleas of his co-conspirators, all of whom were jointly charged with possession of certain items. We held in that case that the guilty pleas were not exculpatory in nature—

---

[4] *Allen v. State*, 878 A.2d 447, 450 (Del. 2005).
[5] *Seward v. State*, 723 A.2d 365, 372 (Del. 1999).
[6] *See* Counts I, IV, and V of the indictment. App. to Opening Br. at A20-A22.
[7] *Id*. at A560.
[8] 458 A.2d 1165, 1169 (Del. 1983).

and were therefore not relevant to Potts's possession charges—because the guilty pleas did not amount to confessions to exclusive possession of the prohibited items.

(17)  Likewise here, Crosby's plea agreement did not establish that Crosby had admitted to exclusive possession.[9]  Thus, the Superior Court did not abuse its discretion by concluding that the plea agreement was not probative of whether Jordan also possessed the gun.  Finally, even if, as Jordan argues, the guilty plea is a statement against interest and admissible under D.R.E 804(b)(3), that rule is subordinate to D.R.E. 402, the paramount rule that evidence that is not relevant is inadmissible.

(18)  What is more, even if we were to conclude that this ruling was an abuse of discretion, the error would be harmless.  The jury had already heard, through the testimony of one of the arresting officers, that Crosby had made the unsolicited comment at the scene that "[e]very thing in the bag is mine.  It has nothing to do with [Jordan]."[10]  In that respect, the plea agreement was cumulative.

(19)  Jordan's second argument on appeal is puzzling; as summarized in Jordan's brief, it is that "the Superior Court committed an abuse of discretion when it ruled mid-trial that Mr. Jordan could not present further evidence or argument

---

[9] App. to Opening Br. at A493–94 ("Well, we don't have a transcript of the plea.  I don't know how detailed it was, or if anything was said as to exclusivity.").
[10] *Id.* at A168.

referring to the date and charges at his arrest, the date and charges at his indictment, and the fact that he was indicted on the new firearms charges prior to the State's receipt of the DNA analysis results."[11]

(20)  Jordan's counsel, in opening statement, had explained the chronology of events following his arrest, emphasizing the timing of certain events to the jury and attempting to use the chronology to create an inference of impropriety in the indictment process.  Jordan noted that he and Crosby were arrested on October 9, 2019, the gun was swabbed for DNA on October 18, and the DNA samples were sent for forensic comparison on November 21.  He also explained that the grand jury indicted Jordan on December 3, for both drug dealing and firearm charges, but emphasized that, at the time of the indictment, the DNA analysis had not yet been received by the State.  Specifically, Jordan told the jury that "what happened . . . on December 3rd, [was that Jordan] was formally charged not just with the drug dealing, . . . he was charged with Carrying a Concealed Weapon.  He was charged with possessing the weapon by a person prohibited, when there was no DNA hit, no link. The only real evidence was the statement, Terrance Crosby, saying ['] everything in the bag is mine it's got nothing to do with him.[']"[12]  The State did not object to this explanation.

---

[11] Opening Br. at 20.

[12] App. to Opening Br. at A67.

(21)   On the second day of trial, however, Jordan questioned the first trial witness—a police officer—about the grand jury indictment process. This time, the State made a relevance objection regarding questions about the grand jury indictment and, later that night, filed a motion *in limine*. The court granted the motion *in limine* the next day.

(22) Jordan's concerns appear to be three-fold:  first, that the State's objection and motion *in limine* were untimely; second, that the court's ruling precluded his exploration of the chief investigating officer's belief at the time of arrest that a magistrate might not find probable cause for Jordan's arrest on the firearm charges; and, third, that because of the ruling, Jordan was improperly precluded from arguing to the jury that "the State's conduct in how it obtained the indictment was improper."[13]

(23)   Jordan offers no legal authority in support of this argument, and our independent examination of his concerns persuades us that the Superior Court's ruling was not an abuse of discretion.

(24)   First, the State's objection was not untimely because it objected during the questioning of the first witness at trial—that is, the first time evidence relating to the grand jury indictment process was offered.  Jordan's argument—that the objection was untimely because the State did not object during Jordan's opening

---

[13] Opening Br. at 28.

statement—is misguided; opening statements are not evidence. Indeed, the State's motion *in limine* and its objection were both directed at Jordan's questioning of witnesses, not at the strategy itself. Because the target of the State's objection was evidence—testimony elicited from a witness—and the opening statement did not seek to introduce evidence on the same issue, the State's objection was not untimely.

(25) Nor are we persuaded that Jordan's line of questioning was meant to elicit relevant evidence. Jordan does not explain, for instance, the relevance to his guilt or innocence of the chief investigating officer's purported belief that a magistrate might have refused to issue a warrant on the firearms charges without the DNA evidence, and we see none.

(26) To the extent that Jordan's questions were meant to challenge the grand jury indictment, his challenge is without merit. Indictments are accusations, not evidence of guilt. Indictments themselves provide no evidence and do not prove anything, and the Superior Court instructed the jury to that effect. More to the point, the timing of the indictment in relation to production of the DNA results is not probative of whether Jordan was, in fact, guilty or not guilty of the crimes for which he was indicted. The Superior Court thus did not abuse its discretion in prohibiting Jordan from questioning witnesses regarding the grand jury indictment process. That process, in any event, was not challenged prior to trial. And as the Superior Court

10

correctly found, any challenge to the grand jury indictment process was therefore waived under Delaware Superior Court Criminal Rule 12(b)(2).[14]

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:


*/s/ Gary F. Traynor*
Justice

---

[14] Del. Super. Ct. Crim. R. 12(b)(2) requires that "[d]efenses and objections based on defects in the indictment or information" "must be raised prior to trial."